AO106 (Rev. 10/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

**SOUTHERN** _____ DISTRICT OF _____ TEXAS SEP 2 6 2008

United States District Court
Southern District of Texas
FILED

Michael N. Milby, Clerk of Court

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

14526 Merry Meadow Drive, Houston, Texas

Case Number:  M-08-5571-M-E

I, _____ Katherine Gutierrez _____ , being duly sworn depose and say:

I am a(n) _____ Federal Bureau of Investigation Special Agent _____ and have reason to believe
<span>Official Title</span>

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

See Attachment A

in the Southern District of Texas there is now concealed a certain person or property, namely
(describe the person or property to be seized)

See Attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)

property that constitutes evidence of the commission of a criminal offense; fruits of crime; or property designed or
intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title _____ 21 / 18 _____ United States Code, Section(s) _____ 841 and 846 / 1956 _____ .
The facts to support a finding of probable cause are contained in the attached affidavit and made a part hereof.
See Attachment C

OK to file. TNT 9/26/08

Signature of Affiant

Sworn to before me and subscribed in my presence,

September 26, 2008
Date

at _____ McAllen, Texas _____
City and State

Peter E. Ormsby/United States Magistrate Judge
Name and Title of Judicial Officer

Signature of Judicial Officer

## ATTACHMENT A

Address:          14526 Merry Meadow Drive, Houston, Texas

The premises at 14526 Merry Meadow Drive, Houston, Texas.  The property to be searched includes a single family residence, including, the garage, all vehicles, outbuildings, appurtenance and curtilage located at 14526 Merry Meadow Drive, Houston, Texas.  The residence is a one story, single family residence located on the southwest corner of the intersection of Merry Meadow Drive and Lansdown Drive.  The front door of the residence faces north and the two car attached garage is on the south side of the residence accessed through an alley.  The residence is brown brick, with white and brown trim, a composite shingle roof with burglar bars on the windows and front door. A 6' wooden fence enclosing the yard on the east side of the residence.  "14526" is on the mailbox located at the curb directly in front of the front door.



## ATTACHMENT B

The items to be seized include, but are not limited to, the following:

1. Proceeds (monetary instruments) related to the distribution of controlled substances and items purchased with illegal proceeds.

2. Identification and contact information of those individuals and businesses possibly related to the possession and distribution of controlled substances.

3. Computer software and hardware and/or safes where evidence of controlled substance and/or money laundering violations may be stored.

4. Books, notes, ledgers, and/or records related to the illegal distribution of controlled substances.

5. Books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegal controlled substances and the proceeds which they generate.

6. Records concerning bank accounts, brokerage accounts, and records of off-site locations to store records, including safe deposit keys, records and receipts, rental agreements for storage facilities, records of mail and answering services including telephone pagers.

7. Addresses or telephone numbers in books or papers.

8. Papers, tickets, notes, schedules, receipts, and other items relating to domestic and international travel.

9. Photographs, in particular, of co-conspirators, assets, and/or controlled substances.

10. Indicia of occupancy, residency, and/or ownership of the premises, including their businesses and residences, which includes but is not limited to, utility and telephone bills, canceled envelopes, keys and documents reflecting the manner and means of the purchase of the

property.

      11. Telephone bills, cellular telephones, pagers, answering machine(s), telephone note pads and notes, contacts and other documents reflecting the ownership, subscriber information, and the use of the telephones, which are often used by large-scale controlled substances traffickers as a tool of the trade (to include the memories of cellular telephones, pagers, and answering machines).

      12. Any type of item used to hide, conceal, mask, secrete or transport illegal contraband, in particular controlled substances and/or drug proceeds.

## ATTACHMENT C

I, Katherine R. Gutierrez, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

1.      I am a Special Agent with the FBI, duly appointed according to law and acting as such, and have been employed by the FBI since October 1996.  As a FBI Special Agent, I am an "investigator or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am currently assigned to the McAllen Resident Agency of the San Antonio Division of the FBI.  Since becoming a Special Agent, I have participated in numerous criminal investigations, including many involving drug trafficking.  I have conducted or participated in physical and electronic surveillance including court authorized wire interceptions, execution of search warrants, debriefings of informants and reviews of taped conversations and narcotics records.  Through my training, education and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, the manner in which acts of public corruption are committed, and the efforts of persons involved in such activities to avoid detection by law enforcement, including the use of vague and/or coded language during their conversations related to drug trafficking and money laundering activities.  I am also familiar with the interplay between public corruption, largely related to state and federal law enforcement officials, and drug traffickers located in the Rio Grande Valley area of Texas.  Among other duties, I am currently involved in an investigation that focuses on an illegal drug trafficking organization operating in the Rio Grande Valley of South Texas.

2.      Based on my knowledge of this investigation as well as conversations with other

agents also assigned to this investigation, and my training and experience regarding the trafficking of marijuana, cocaine and other controlled substances, I know that:

a. Purchases of illegal controlled substances are almost always paid for with United States currency, commonly known as "cash." Cash is used to pay for illegal controlled substances because of the difficulty in tracing cash transactions. The relatively small quantities of cash used to buy illegal drugs for personal use are gathered by persons who sell those drugs in those quantities and are used to purchase drugs in bulk quantities. Large quantities of cash are needed and used to purchase illegal drugs in bulk quantities. As a result, large quantities of United States currency are a tool of the trade of illegal drug trafficking. Legal transactions involving large sums of money are seldom conducted with cash because of the effort involved in securing large quantities of cash from legal sources, the effort involved in counting and transporting large quantities of cash, and because of the greater risk of financial loss by robbery or theft in cash transactions. As a result, the presence of a large quantity of United States currency is a strong indicator of illegal drug trafficking. Additionally, drug traffickers often keep these large amounts of United States currency on hand in order to maintain and finance their on-going drug business;

b. Large quantities of illegal drugs are smuggled north into the United States from Mexico while United States currency to pay for those drugs is smuggled in the opposite direction. Both the smuggling of drugs north to be consumed and the smuggling of drug proceeds south to pay for those drugs are common features of illegal drug trafficking operations.

c. It is very common for drug traffickers to use residential properties close to the border with Mexico as storage locations where loads of drugs are temporarily stored on their way north and as locations where loads of drug proceeds are temporarily stored on their way south into Mexico. Residential properties used in this fashion are commonly known as stash houses. Stash houses

typically contain very few furnishings in that their function is not to provide a place for someone to live but to be a place to store and package drugs or drug proceeds. When discovered by law enforcement, stash houses are typically found to contain materials and paraphernalia for the wrapping of drugs and/or drug proceeds. Drug ledgers and drug tally sheets are sometimes also found at stash houses. Because they are used as temporary storage facilities for drugs or drug proceeds, stash houses are sometimes found to contain large quantities of drugs, large quantities of drug residue, or large quantities of drug proceeds in the form of United States currency.

d. Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale and distribution of illegally controlled substances.

e. These individuals commonly front (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some type of record concerning monies owed. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the dealer in illegal controlled substances has ready access to them such as on his/her person, in his/her motor vehicles, in his/her residence or other place of operation.

f. It is common for large scale drug traffickers to secrete contraband, the proceeds of drug sales, to include jewelry, and records of drug transactions in secure locations, to include but not limited to safes and/or hidden compartments, for ready access and concealment from law enforcement authorities.

g. It is common for persons involved in drug trafficking to conceal in their businesses, residences, motel rooms, and other secure locations, with ease of access, caches of controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value and/or proceeds of drug transactions; and evidence of financial transactions relating

to obtaining, transferring, secreting, or spending large sums of money from engaging in drug trafficking activities.

h. When drug traffickers amass large amounts of proceeds from the sale or distribution of drugs, they often attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, shell corporations, business fronts and attorney's services to acquire and conceal expensive assets purchased with proceeds from controlled substances trafficking.

i. Drug traffickers often amass large amounts of proceeds and have bank accounts, brokerage accounts, and documents identifying locations where records are stored, including safe deposit keys, records and receipts, rental agreements for storage facilities, records of mail and answering services including telephone and pagers, and that such items are secured within their residences, motel rooms, and businesses for easy access; or in nearby residences of their drug trafficking associates and/or relatives and that drug traffickers retain these records for a long period of time.

j. Marijuana/cocaine traffickers often place assets in other names and in the names of corporate entities to avoid detection and seizure of those assets by law enforcement officers.

k. Even though these assets are in other person's names, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

l. Items such as duct tape, cellophane wrap, packaging tape, scales, and heat sealers are used to package controlled substances for resale and the proceeds derived therefrom.

m. Drug traffickers utilize numerous methods to hide, mask, secrete, transport and conceal illegal contraband, including  controlled substances and the proceeds derived therefrom.

n. Drug traffickers often travel to foreign countries and northern points in the United States

where narcotics will sell for higher amounts. When traveling, drug traffickers will amass papers, tickets, notes, schedules, receipts, and other items relating to domestic and international travel.

o. Drug traffickers often take pictures, trophy shots of co-conspirators, assets, and/or controlled substances, in particular marijuana and cocaine.

3. Furthermore, based upon my training and participation in these types of investigations in the United States, I know that individuals who engage in the trafficking of illegal controlled substances and monies laundered therefrom, acquire and keep in their residences, vehicles, motel rooms, and businesses, documents and other evidence of their illegal activities, including the following:

a. Scales and weighing devices, measuring devices, containers, paraphernalia, duct tape, cellophane wrap, packaging tape, scales, and heat sealers utilized in the packaging of controlled substances and monetary proceeds derived from selling controlled substances.

b. Books, records, receipts, bills of lading, notes, ledgers, and other papers relating to the transporting, ordering, purchase and distribution of controlled substances and the subsequent movement of proceeds derived therefrom.

c. Books, records, telephone books, address books, receipts, bank statements and records, money drafts, letters of credit, money order and cashier's checks, receipts, passbooks, bank checks, safe deposit box keys, codes, encryption information, documents reflecting the manner and means to access encrypted entries, computer information stored by means of electronic or magnetic devices, including but not limited to, floppy disks, CD ROM, zip drives, zip disks, fax machines, compact discs, laptops, personal directory assistant, external drives, electronic storage devices, hard drives, back-up hard drives and tapes, as well as printouts or readouts from any magnetic or electronic storage, and other items evidencing the names, nicknames, addresses, phone numbers of members

of the drug trafficking organization and evidencing the obtaining, secreting, transferring, concealing and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money.

d. United States currency, precious metals, jewelry, and financial instruments, including stocks and bonds in amounts indicative of the proceeds of illegal controlled substances trafficking.

e. Indicia of occupancy, residency, and/or ownership of the premises, including their businesses and residences, which includes but is not limited to, utility and telephone bills, canceled envelopes, keys and documents reflecting the manner and means of the purchase of the property.

f. Computer hardware, software, peripheral devices, documentation, data security devices, electronic storage devices and safes as necessary to search for and seize the items described above.

g. Individuals who deal in illegal controlled substances consistently utilize cellular phones as a method of communicating during narcotic trafficking events. Narcotic traffickers often store co-conspirator's telephone numbers in memory and communicate using code names through cellular phones to conceal their identity. These individuals maintain telephone bills, cellular telephones, prepaid cellular telephones, prepaid calling cards, pagers, answering machine(s), telephone note pads and notes, contacts and other documents reflecting the ownership, subscriber information, and the use of the telephones, which are often used by large-scale controlled substances traffickers as a tool of the trade.

4. Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order and with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

5. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.      Examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

   b.  Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

   c.  Surveying various file directories and the individual files they contain;

   d.  Opening files in order to determine their contents;

   e.  Scanning storage areas;

   f.  Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

   g.  Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

  6. I anticipate that during the execution of the requested search warrants and the subsequent search of any and all computer and any and all other computers, hardware, software, and storage devices, related to any computers seized in the execution of said warrant, that said item or items will have to be physically removed from the search area for a thorough and complete examination at a laboratory. I have been advised by computer technicians who would conduct the examination that searching, analyzing and seizing information from computer(s) and related electronic storage media often requires analysis by a qualified computer expert in a laboratory or other controlled environment. This is true based on the volume of evidence that can be stored on a computer or computer related storage device and the technical requirements to search said computer and computer related storage devices, as noted above in paragraph 4. Therefore, I respectfully request

that the Court indicate that once seized, the actual execution of the search on the computer or computer(s) in question may be executed at anytime in the day or night in a laboratory setting and that the return be due in a reasonable amount of time. The latter request is being made because based on me being advised that a search of a computer and related electronic storage format takes longer than the usual ten (10) days because of the technology involved in reviewing and searching said items. Alternatively, I would seek a return, if not for a reasonable amount of time, a time period not to exceed thirty (30) days.

## LOCATION TO BE SEARCHED

7. This affidavit is made and submitted in support of an application for a warrant to search the following location within the Southern District of Texas:

A.      14526 Merry Meadow Drive, Houston, Texas: This residence is utilized by Mayra TREVINO Flores and her husband Jose de Jesus HERNANDEZ. The residence is a one story, single family residence located on the southwest corner of the intersection of Merry Meadow Drive and Lansdown Drive. The front door of the residence faces north and the two car attached garage is on the south side of the residence accessed through an alley. The residence is brown brick, with white and brown trim, a composite shingle roof with burglar bars on the windows and front door. A 6' wooden fence enclosing the yard on the east side of the residence. "14526" is on the mailbox located at the curb directly in front of the front door. See ATTACHMENT A.

## BACKGROUND OF INVESTIGATION

8.      The FBI San Antonio Division, McAllen RA began investigating the Jose Carlos HINOJOSA Drug Trafficking Organization (DTO) in October 2005. The investigation is being jointly worked with IRS McAllen, DEA McAllen and the Houston Police Department. HINOJOSA has been identified as a Gulf Cartel member operating in Mexico and the Rio Grande Valley (RGV)

in South Texas.  The HINOJOSA DTO is responsible for the smuggling, transportation and distribution of multi-kilogram quantities of cocaine and marijuana from Northern Mexico into and throughout the United States.  The HINOJOSA DTO is also responsible for the laundering of drug proceeds derived from the sale of cocaine and marijuana.  Through debriefings of various reliable cooperating witnesses, review of documents seized in relation to seizures, physical surveillance, and/or electronic surveillance, several drug and money seizures have been connected to the HINOJOSA DTO including the following:  a) on February 22, 2002, the Harlingen Police Department Special Investigations Unit (SIU) seized 1,302 pounds of marijuana; b) on October 18, 2005, ICE and the Starr County High Intensity Drug Trafficking Area (HIDTA) Task Force executed a state search warrant at 1103 North Utica Street, Roma, Texas and seized approximately 3,465 pounds of marijuana from the residence; c) on October 30, 2005, a federal search warrant was executed at 1007 Gladiator, Roma, Texas and two hundred sixteen (216) kilograms of cocaine were seized from the residence; d) on August 21, 2006, Starr County HIDTA Task Force obtained consent to search the residence at Deer Loop Lot #88, Falcon Heights, Texas, and seized one hundred eight (108) bundles of marijuana weighing approximately 1,952 pounds from the residence; e) on September 7, 2006,  the Hidalgo County HIDTA Task Force initiated a traffic stop that resulted in the seizure of $179,940.00 in U. S. currency, a semi-automatic Sig-Sauer .40 caliber handgun from a 1999 Ford Ranger pickup truck; f) on December 7, 2006, approximately six hundred forty (640) pounds of marijuana were seized by the Webb County Sheriff's Department after a traffic stop of a 1992 white Ford F-250 pickup truck; g) on December 11, 2006, approximately six hundred eighteen (618) pounds of marijuana were seized by the Laredo Financial Narcotics Enforcement Team Task Force after the execution of a state search warrant of a storage locker at Storage Solutions, 1704 OWK Road, Laredo, Texas, Unit #212; h) on April 28, 2007, approximately twelve

(12) kilograms of cocaine were seized by the ICE Starr County HIDTA Task Force after a traffic stop of a late 1990's model gray Oldsmobile Eighty-Eight in Roma, Texas; i) June 27, 2007, approximately seven hundred (700) pounds of marijuana and one (1) kilogram of cocaine were seized by the ICE Starr County HIDTA Task Force as the result of a consent search of a residence on Violet Avenue in Roma, Texas; j) October 1, 2007, approximately $131,000.00 in U.S. currency and a 1998 Mercedes Benz were seized by the Starr County HIDTA Task Force after a consent search of the vehicle in Rio Grande City, Texas; k) December 1, 2007, approximately seven (7) kilograms of cocaine were seized by the Fort Bend County Narcotics Task Force after a traffic stop of a 1995 gold Mercury Mystique LS; l) December 4, 2007, approximately $299,920.00 in U.S. currency was seized by the Fort Bend County Narcotics Task Force after a traffic stop of a 2006 Ford F-350 pickup truck; m) December 8, 2007, approximately $200,230.00 in U.S. currency was seized by the Fort Bend Narcotics Task Force after a traffic stop of a 2003 Chevrolet Silverado pickup truck; n) January 19, 2008, approximately $30,000.00 in U.S. currency was seized at the Roma, Texas, Port of Entry when Mayra TREVINO failed to declare the currency as she attempted to depart the United States; o) July 8, 2008, approximately fourteen (14) kilograms of cocaine were seized after a traffic stop of a vehicle in Houston, Texas; and p) July 9, 2008, approximately twenty-two (22) kilograms of cocaine was seized after a traffic stop of a vehicle in Fort Bend County, Texas.

9.      Between June and December 2007 and June and August 2008, as part of this investigation, Title III wire intercepts were conducted on at least twelve cellular telephones utilized by members and/or associates of the HINOJOSA DTO.

10.     On June 26, 2007, while conducting follow-up investigation on a matter which was believed to be unrelated to the HINOJOSA DTO, the ICE Starr County HIDTA Task Force obtained consent to search a residence located at 601 Violet Avenue, Roma, Texas. The consent was obtained

from Sergio TREVINO Silva, the driver of a vehicle seen departing the residence and cousin to Mayra TREVINO Flores.  Approximately seven hundred (700) pounds of marijuana and one (1) kilogram of cocaine was seized from the residence.  During the search, it was learned that the residence belongs to Mayra TREVINO Flores, the subscriber of cellular telephones utilized by HINOJOSA and his right hand man, Eduardo Nicolas BARRAGAN-Balderas, to conduct drug trafficking and money laundering activities.  TREVINO Silva was not arrested at the time but has been charged as part of this investigation.

11.      On June 27, 2007, pursuant to court authorized wire interceptions of (956) 208-2774 (hereinafter referred to as TARGET TELEPHONE #1), utilized by HINOJOSA, and (956) 844-6983 (hereinafter referred to as TARGET TELEPHONE #2), utilized by GUERRA,  DEA and FBI agents, respectively,  intercepted GUERRA and HINOJOSA.  HINOJOSA told GUERRA that an individual who works for the Sheriff's Office went to a house belonging to a friend of HINOJOSA who lives in Houston, Texas.[1]  HINOJOSA said that the friend's brother-in-law asked to borrow the house and left some "things" in the house.  According to HINOJOSA, a cousin of the brother-in-law was pulled over by law enforcement, got scared and gave up the house allowing the officers to search the residence.  HINOJOSA believed that the guy who was pulled over must have given up "everything" because he was let go but everything was taken from the house.  HINOJOSA asked GUERRA to find out how everything happened.  GUERRA stated he would make some calls and call HINOJOSA back.

12.      Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that during this call

---

[1] The synopses of recorded telephone conversations obtained through court-authorized interception of wire communications set forth in this affidavit are not verbatim, but are the sum and substance of the call summaries.  The conversations were recorded in the Spanish language and excerpts are based upon Spanish to English translations of trained linguists  To the extent quotations are used in the descriptions below, the quoted segments are based on reviews of recordings and are not final transcripts.

HINOJOSA is referring to the above referenced June 26, 2007, seizure of marijuana and cocaine from Mayra TREVINO Flores' residence at 601 Violet Avenue, Roma, Texas. Furthermore, I believe that HINOJOSA is asking GUERRA to find out law enforcement sensitive information such as if the brother-in-law cooperated with law enforcement and whether the brother-in-law implicated anyone else regarding the marijuana and cocaine seized from the residence.

13.      Later that same day, GUERRA was intercepted telling HINOJOSA that everything had been fixed. GUERRA stated that what was needed to "close the case" was "a letter to whom the lady rented the house to. Someone from the other side. HINOJOSA asked GUERRA "how did they find out about that?"  GUERRA asked when HINOJOSA was "coming over" or "someone" HINOJOSA "trust" to come over to "talk" so GUERRA could  "explain." HINOJOSA said he (HINOJOSA) would be "over there" the next day. GUERRA said "there are birds on the wire" and for HINOJOSA to "be very careful."

14.      Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that during this call GUERRA is instructing HINOJOSA and TREVINO to provide a false document to the investigating officers showing that an individual from Mexico was renting TREVINO's residence at the time of the seizure. I believe that GUERRA suggested that the renter be from Mexico assuming that it would be more difficult for the officers to determine if in fact the person existed when trying to locate this person to be interviewed. When HINOJOSA asked "how did they find out about that" I believe that HINOJOSA was asking if an individual had provided information to law enforcement identifying the house as containing drugs. When GUERRA asked when HINOJOSA or someone HINOJOSA trusted would be coming over so GUERRA could "explain" I believe that GUERRA intended to tell HINOJOSA or HINOJOSA's trusted associate any and all law enforcement sensitive

information GUERRA had regarding the events leading up to the seizure at TREVINO's residence. When GUERRA commented that "there are birds on the wire" I believe this was a coded message acknowledging that it would be wrong for GUERRA to provide such information to HINOJOSA and/or HINOJOSA's associate and therefore did not want to do so over the telephone in the event that law enforcement was listening to the conversation.

15.     On June 28, 2007, pursuant to the court authorized wire interception of TARGET TELEPHONE #1, DEA agents intercepted an incoming call from Mario Alberto MASCORRO. HINOJOSA told MASCORRO that HINOJOSA had spoken to "Tio" (GUERRA) and GUERRA had told HINOJOSA what needed to be taken to GUERRA. HINOJOSA stated that GUERRA was insisting that HINOJOSA or someone trusted by HINOJOSA go see GUERRA before GUERRA was scheduled to leave town. HINOJOSA stated that GUERRA had instructed HINOJOSA to have TREVINO bring the rental documents to GUERRA. MASCORRO agreed to see GUERRA on HINOJOSA's behalf to see what it was that GUERRA wanted to tell HINOJOSA. HINOJOSA then instructed MASCORRO to pay GUERRA "three bucks" and to tell GUERRA that it came from HINOJOSA. HINOJOSA first said to pay "two bucks" then changed it to "three bucks," commenting that he could make them up in one shot. HINOJOSA told MASCORRO that he did not want to cross into the United States from Mexico because he was concerned after an unspecified female told him that she had checked on him at the bridge and found out that HINOJOSA was being investigated.   HINOJOSA asked MASCORRO if "Tio" (GUERRA) could check out that information. MASCORRO explained to HINOJOSA that "Tio" (GUERRA) would not be able to check on that because the investigation would be handled by a different agency. HINOJOSA asked if "Tio" (GUERRA) could run HINOJOSA's driver's license to see if HINOJOSA had any problems. MASCORRO told him that if someone did "they" could see who was running HINOJOSA's name

and that person could get fired.

16.        Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that when HINOJOSA told MASCORRO to pay GUERRA "three bucks" that that was code for $3,000.00 and that the money was a payment to GUERRA for having provided HINOJOSA and HINOJOSA's drug trafficking associates with instructions on providing false documents to the investigating officers as well as law enforcement sensitive information pertaining to the investigation.  On the same day, GUERRA was intercepted pursuant to a court authorized wire intercept of TARGET TELEPHONE #2, utilized by GUERRA, stating that he (GUERRA) needed to go to the bank to make a deposit. Agents believe that MASCORRO met with GUERRA and provided GUERRA the money as requested by HINOJOSA.  I also believe that MASCORRO explained to HINOJOSA how "offline" searches can be conducted of law enforcement databases to determine who has queried specific names.  If it is determined that a law enforcement officer did not have a legitimate reason to query an individual, the officer is subject to prosecution and/or being fired.

17.        Also on June 28, 2007, pursuant to the court authorized interception of TARGET TELEPHONES #1 and #2, DEA and FBI agents intercepted a series of incoming and outgoing calls between GUERRA and HINOJOSA.  HINOJOSA told GUERRA that TREVINO was in town and had the papers but that an investigator had called TREVINO and told TREVINO to fax the papers to him.  HINOJOSA wanted to know if TREVINO should fax the papers or take them to GUERRA. GUERRA told HINOJOSA to have the papers brought to him (GUERRA).  GUERRA said for TREVINO to come to the Sheriff's Department to meet with GUERRA.  FBI agents established surveillance of the Starr County Sheriff's Department and observed TREVINO depart the building.

18.        Based on my training, experience, conversations with other agents involved in this

investigation, and my knowledge of this investigation in its totality, I believe that during these calls GUERRA was instructing HINOJOSA to have TREVINO bring the fraudulent rental documents to GUERRA at his office. In normal investigative practice, GUERRA would instruct an individual to interact directly with the investigating officer and not GUERRA. Agents are aware that GUERRA summoned the lead investigator to his office and had TREVINO provide the documents to the investigator in front of GUERRA. Outside the presence of TREVINO, GUERRA commented to the investigator that he (GUERRA) did not know TREVINO. The above referenced intercepted conversations indicate that GUERRA knew of TREVINO from HINOJOSA and had explicitly requested that she come to GUERRA's office versus deal directly with the investigator. As the investigator was about to leave the office, GUERRA commented that the lease agreement provided by TREVINO should be the only documents needed to "close" the case. I believe that GUERRA was attempting to utilized his position as the Sheriff to pressure the investigator into not looking at TREVINO and/or other members and/or associates of the HINOJOSA DTO as a possible defendants in the matter regarding the marijuana and cocaine found at her home. Agents have confirmed that on June 28, 2007, TREVINO flew on Southwest Airlines flight #19 from Houston, Texas to Harlingen, Texas, and as stated above later surveilled TREVINO depart the Starr County Sheriff's Department after meeting with GUERRA.

19.     Also on June 28, 2007, approximately fifteen (15) to twenty (20) minutes after TREVINO departed GUERRA's office, pursuant to the court authorized wire interception of TARGET TELEPHONE #1, utilized by HINOJOSA, DEA agents intercepted an outgoing call to Jose de Jesus HERNANDEZ, Mayra TREVINO Flores' husband. HERNANDEZ told HINOJOSA that he (HERNANDEZ) called "just to thank you, dude. Damn, I'm so in debt with you there...Those are favors no one ever forgets. I will send you a small token of my appreciation later. And thanks

a lot, dude." HINOJOSA responded saying, "there is no problem.....you don't have to send me shit, dude....Did you see Mayra charging me for taking out...help me out about Abby's truck and shit....This guy....I mean, that he would give me a hand. The guy is...I mean, I always send him money. Because of the same thing, right? So one would have the doors open." HINOJOSA then asked "who did that shit belong to?" And HERNANDEZ responded "all of us were in there, the young cousin who helps me over here, myself, and another guy from over here."

20.       Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that during this call HERNANDEZ was calling HINOJOSA to thank HINOJOSA having GUERRA assist HERNANDEZ and TREVINO in avoiding prosecution for their involvement in with the above referenced June 26th seizure and/or the forfeiture of the residence on Violet. I am aware that HINOJOSA's wife, Abigaly Garcia, used to drive a pickup truck registered in her and TREVINO's names. Therefore, when HINOJOSA referred to "Mayra" not "charging" and "Abby's truck" I believe that he (HINOJOSA) was referring to TREVINO co-signing on a loan for a pickup truck driven by Garcia. When HINOJOSA said he (HINOJOSA) always sends "him money" to "have the doors open," I believe HINOJOSA was referring to making bribe payments to GUERRA for GUERRA's assistance to HINOJOSA and HINOJOSA's drug trafficking associates in furtherance of their illegal activities. I also believe that HERNANDEZ was informing HINOJOSA that he (HERNANDEZ), Sergio TREVINO Silva (referred to as a young cousin) and an unidentified male from the Houston area had financially gone in together to purchase the marijuana and cocaine seized on June 26th from TREVINO's residence on Violet.

21.       Also on June 28, 2007, pursuant to the court authorized wire interception of TARGET TELEPHONE #1, utilized by HINOJOSA, DEA agents intercepted an incoming call from

Jose de Jesus HERNANDEZ, Mayra TREVINO Flores' husband.  During the conversation, HINOJOSA again asked HERNANDEZ "tell me who, who your associates were..on that, on that job..and who all knew." HERNANDEZ responded, "on that job only El Primi'..and El Enano knew. In other words, just that it was there.  That's all.  El Primillo was there...that load belonged to El Primillo, me, El Enano had also added some there, and,...and, and one of Primillo's compadre's.  But no, that guy is over here."  HINOJOSA then asked "who's from Mission?"  HERNANDEZ stated "oh, in Mission, no, man.  Not in Mission, I don't have anyone that lives....That I know of someone in Mission, no."  HINOJOSA responded "the problem came from over there."

22.      Based on conversations intercepted pursuant to the court authorized wire interception of TARGET TELEPHONE #2, utilized by GUERRA, FBI agents knew that GUERRA was going to make contact with Starr County Sheriff's Department Investigator Pedro Estrada who is assigned to the ICE led Starr County HIDTA Task Force.  Agents believed that GUERRA was going to question Estrada about the seizure at TREVINO's residence for the purpose of obtaining information to be provided to HINOJOSA.  Agents contacted Estrada and requested that Estrada tell GUERRA that the information which led him to TREVINO's residence was provided by an individual by the name of "Homero Flores" from Mission, Texas.  The information was false information and if HINOJOSA and/or any of his associates learned of the information, the only way they could have known was through GUERRA.  The above referenced conversation in which HINOJOSA asked HERNANDEZ "who's from Mission?" shows that GUERRA provided what would be considered law enforcement sensitive information to HINOJOSA and/or one of his associates such as possibly MASCORRO, when agents believe MASCORRO met with GUERRA to pay what agents believe to be approximately $3,000.00 on behalf of HINOJOSA.

23.      On August 2, 2007, pursuant to a court authorized wire intercept of cellular

telephone (956)780-9822 (hereinafter referred to as TARGET TELEPHONE #3), utilized by Sergio Ivan OLIVARES-Flores, A.K.A. Loba, a trusted member of the HINOJOSA DTO, FBI agents intercepted OLIVARES-Flores placing an outgoing call to TREVINO. OLIVARES-Flores asked TREVINO "how much needs" to be "paid?" TREVINO replied stating "when I told Carlos" it was "1,600" for the "2 months" and another "month" has passed now it's "1,660 plus 830."

24.     Based on my training, experience, conversations with other agents involved in this investigation, and my knowledge of this investigation in its totality, I believe that during this call OLIVARES-Flores is asking TREVINO how much the DTO needs to pay TREVINO for the rental of a property, owned and/or controlled by TREVINO, either in Mexico and/or the United States which I believe is utilized in furtherance of the DTO's illegal activities, possibly as a stash location for illegal controlled substances and/or drug proceeds.

25.     On January 19, 2008, TREVINO was arrested at the Roma, Texas, Port of Entry when she failed to declare approximately $30,000.00 in U.S. currency as she departed the United States for Mexico. TREVINO stated that she had forgotten the currency was in her purse and that it was proceeds from the sale of a residence. According to TREVINO, the residence she sold was located in Miguel Aleman, Tamaulipas, Mexico, and had been given to her by her father. She further stated that the buyer paid her in Roma, Texas. However, her sister, who was a passenger in the vehicle at the time of her arrest, was asked about the sale of the residence and indicated she was unfamiliar with their father having given a residence to TREVINO which was recently sold. Approximately two days later, TREVINO voluntarily spoke with HIDTA Task Force Officers in Roma, Texas. TREVINO acknowledged knowing HINOJOSA and that GUERRA had assisted in getting her quickly released on a $15,000.00 surety bond.

26.     On July 7, 2008, HINOJOSA and HERNANDEZ were surveilled meeting in

Houston, Texas.  HINOJOSA, HERNANDEZ and several other known and unknown members and/or associates of the HINOJOSA DTO were surveilled at the Galleria Mall as well as on a boat on a lake outside Houston.  Based on the observations of surveillance agents, HERNANDEZ appeared to be catering to HINOJOSA throughout the day.

27.     According to 2008 Harris County Appraisal District information, 14526 Merry Meadow Drive, Houston, Texas, the location requested to be searched, is owned by Rene and Olga Flores.  At the time of TREVINO's arrest on January 19, 2008, a copy of a Rental Agreement was found within her documents.  The agreement was for the above referenced address and identified Rene Flores as "Management" and Jose Hernandez and Mayra Trevino as "Resident(s)."  The agreement was for the time period of November 15, 2007 to December 15, 2008 with a stated monthly payment of $750.00.  Also found within the documents in TREVINO's possession at the time of her arrest was a Comcast payment stub in TREVINO's name, dated November 1, 2007 at 14526 Merry Meadow Drive; a book of checks for a Wells Fargo Bank account in TREVINO and HERNANDEZ' names showing an address of 14526 Merry Meadow Drive; and a piece of paper with notes written on it including radio code "145*4*16024" which is the radio code associated with TARGET TELEPHONE #1 as noted in this affidavit as being utilized by HINOJOSA.

28.     As stated previously in this affidavit, TREVINO was the subscriber of two cellular telephones utilized by HINOJOSA and his right-hand man, Eduardo Nicolas BARRAGAN-Balderas. Court authorized wire interceptions of both of these cellular telephones were conducted during the course of this investigation.  During the previously referenced June 26, 2007, consent search of 601 Violet Avenue, Roma, Texas, a residence owned by TREVINO, copies of the Sprint/Nextel Corporation monthly bills for the account which includes these numbers were found at the residence. Numerous documents and photographs were also seized from the residence in addition to the

marijuana and cocaine.  Many of the photographs included TREVINO, HERNANDEZ, HINOJOSA and several other members and/or associates of  the HINOJOSA DTO in social settings such as weddings and/or parties.  Given TREVINO's apparent role within the DTO as that of assisting in obtaining cellular telephones in her name to be used by members of the DTO to coordinate drug trafficking activities and making locations/residences available for drug trafficking activities and HERNANDEZ' role of overseeing a distribution cell in the Houston, Texas, area, agents believe they would find records, supporting these roles, which individuals are known to maintain for extended periods of time typically within their residences.

29.        On September 10, 2008, investigators observed TREVINO arrive at 14526 Merry Meadow Drive driving a black 2007 GMC Yukon registered to her at that address.  She was accompanied by her toddler son.  Also seen at this address within the last two weeks was a 2007 Volkswagon Touareg, registered to TREVINO at the Merry Meadow address.  On July 7, 2008, HERNANDEZ was surveilled driving the Touareg while meeting with HINOJOSA and other members and/or associates of the DTO in Houston, Texas.  On September 25, 2008, TREVINO was arrested at the Roma, Texas, Port of Entry, on charges related to her involvement in this investigation.  At the time of her arrest, TREVINO advised that she and her family continue to live at 14526 Merry Meadow Drive, Houston, Texas.